UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MELISSA M. PITMAN,                  )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          Case No. 1:15-cv-356
                                    )
NANCY A. BERRYHILL,                 )
Acting Commissioner of Social Security,[1]  )
                                    )
            Defendant.              )

## OPINION AND ORDER

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, Melissa M. Pitman, on November 24, 2015.[2]  For the

following reasons, the decision of the Commissioner is **REMANDED.**

*Background*

The plaintiff, Melissa Pitman, filed an application for Disability Insurance Benefits on

April 16, 2012, alleging a disability onset date of January 8, 2008.  (Tr. 23).  The Disability

Determination Bureau denied Pitman's application on July 12, 2012, and again upon

reconsideration on August 23, 2012.  (Tr. 23).  Pitman subsequently filed a timely request for a

hearing on September 20, 2012.  (Tr. 23).  A hearing was held on October 1, 2013, before

Administrative Law Judge (ALJ) William D. Pierson, and the ALJ issued an unfavorable

---

[1]      Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W.
Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]      On February 8, 2016, this case was reassigned to Magistrate Judge Susan L. Collins upon the parties'
consent under 28 U.S.C. § 636(c), and then was reassigned to Magistrate Judge Andrew P. Rodovich.  On August 5,
2016, the court ordered the parties to file any objection to Magistrate Judge Rodovich conducting all further
proceedings in this case.  Because neither party filed an objection, this court finds that the parties voluntarily consent
to Magistrate Judge Rodovich under 28 U.S.C. § 636(c).

decision on April 22, 2014. (Tr. 23–46). Vocational expert (VE) Amy Kutschbach, Pitman, and Pitman's husband testified at the hearing. (Tr. 23). The Appeals Counsel denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

The ALJ found that Pitman last met the insured status requirements of the Social Security Act on June 30, 2012. (Tr. 25). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Pitman had not engaged in substantial gainful activity from her alleged onset date of January 8, 2008 through her date last insured of June 30, 2012. (Tr. 26). At step two, the ALJ determined that Pitman had the following severe impairments: cervical and lumbar degenerative disc disease, a history of asthma and bronchitis, chronic obstructive pulmonary disease, a history or right (dominant) carpal tunnel release surgery, left carpal tunnel syndrome, left shoulder pain, fibromyalgia, insomnia, sleep apnea, obesity, inflammatory arthritis, major depressive disorder, and post-traumatic stress disorder. (Tr. 26). The ALJ found that the above impairments had more than a minimal effect on Pitman's ability to work. (Tr. 26).

At step three, the ALJ concluded that Pitman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 26). The ALJ determined that there was no evidence that Pitman had an exacerbated symptom or any additional impairment because of her obesity and that her obesity did not meet or equal a listing when considered singly or in combination with her other severe impairments. (Tr. 26).

Specifically, the ALJ found that Pitman did not meet Listing 1.04, Disorders of the Spine, because there was no evidence of spinal arachnoiditis to satisfy part B or lumbar spinal stenosis that resulted in pseudo-claudication to satisfy part C. (Tr. 26-27). Also, the ALJ concluded that she failed to meet Listing 1.02, Major Dysfunction of a Joint, because there was no evidence that

she could not use her upper extremities for fine and gross movements. (Tr. 27). Pitman did not meet Listing 3.02A, chronic pulmonary disease, because a May 2012 pulmonary function study yielded a post medication reading of 1.08, which exceeded the required level for Pitman's height. (Tr. 27).

The ALJ has indicated that there was evidence that Pitman had symptoms under the paragraph A criteria for mental impairments, but that she did not satisfy the paragraph B criteria of listings 12.04 and 12.09, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 27). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 27).

Pitman's testimony indicated that she was limited in the above areas, however, the ALJ found that her allegations were not entirely credible. (Tr. 27). The ALJ found that Pitman's husband's reports were generally credible. (Tr. 27). Pitman's husband indicated that Pitman's physical conditions limited her daily activities. (Tr. 27). He reported that she played games on the computer until her back started to hurt and that she was unable to maintain her personal care due to back pain and shortness of breath. (Tr. 27). Also, he stated that she drove, shopped for groceries with the assistance of her daughter, and sometimes dusted and did laundry. (Tr. 27-28). However, she took breaks when she did the chores. (Tr. 28).

Pitman's husband reported that she talked on the telephone once or twice a week, went out to eat about once a month, and got along well with authority figures. (Tr. 28). He stated that she could pay attention for 30 minutes and follow written instructions but at times she needed

spoken instructions repeated.  (Tr. 27-28).  The ALJ assigned some weight to Pitman's husband's reports.  (Tr. 28).  The ALJ concluded that he had a motivation in Pitman receiving benefits but that his reports appeared honest and were not consistent with a finding of disability.  (Tr. 28).

The ALJ found that Pitman had mild restrictions in daily living activities.  (Tr. 28).  The ALJ indicated that her limitations were primarily due to her physical condition.  (Tr. 28).  Pitman testified that her children did the housework, dishes, and their own laundry.  (Tr. 28).  She stated that she cooked, but that she prepared meals that did not require her to stand for long periods of time.  (Tr. 28).  She reported that her daily activities included computer games, jigsaw puzzles, and watching television.  (Tr. 28).

The ALJ found that Pitman had mild limitations in her ability to maintain social functioning.  (Tr. 28).  Pitman testified that she did not have friends, but that she had a good relationship with her mother and occasionally went to lunch with her sister.  (Tr. 28).  The ALJ indicated that she was reasonably conversant and easy to interview at the consultative psychological evaluation.  (Tr. 28).  Also, the ALJ reported that Pitman interacted with healthcare providers without difficulty.  (Tr. 28).

The ALJ found that Pitman had moderate difficulties in concentration, persistence, or pace.  (Tr. 28).  The ALJ indicated that Pitman had numerous psychosocial stressors and ongoing pain, which caused distractions and created difficulties with sustained concentration and focus.  (Tr. 28).  However, Pitman drove herself to her consultative psychological evaluation, arrived on time, and understood most of the interview and examination questions.  (Tr. 28).  The examiner noted that Pitman's long-term memory was intact.  (Tr. 28).  Also, the examiner reported that Pitman gave a reasonably detailed description of activities from the previous day, recalled five

digits forward and four backward, her arithmetic skills were well-developed, and that she did not

have deficits in general knowledge, common sense, or verbal abstract reasoning. (Tr. 28). The

examiner rated Pitman's overall level of functioning, Global Assessment of Functioning (GAF),

at 65. (Tr. 29). The ALJ determined that Pitman's mental impairments did not cause at least two

marked limitations or one marked limitation and repeated episode of decompensation, each of

extended duration to satisfy paragraph B or paragraph C. (Tr. 29).

The ALJ then assessed Pitman's residual functional capacity as follows:

> through the last date insured the claimant has the residual functional
> capacity to perform a limited range of sedentary work as defined in
> 20 CFR 404.1567(a): except she can sit for six hours and stand/walk
> for two hours during an eight-hour workday, frequently bend and
> stoop in addition to what was required to sit, and lift up to ten
> pounds; she cannot use her upper extremities on a constant basis,
> but can frequently reach and perform fine and gross manipulation
> tasks; and as to postural changes she can occasionally kneel, crouch,
> balance, and climb stairs and ramps, but can never climb ladders,
> ropes, or scaffolds; with respect to her work environment, she can
> tolerate less than occasional exposure to concentrated amounts of
> fumes, dust, gases, and extreme cold; she retained the mental
> residual functional capacity to perform simple routine repetitive
> tasks; she can maintain a sufficient level of concentration to perform
> simple tasks and can remember simple work-like procedures.

(Tr. 29-30). The ALJ read and considered all the evidence of record and determined the RFC

was more consistent with the medical findings, treatment records, and overall evidence in the

record than the allegations made by Pitman. (Tr. 30). The ALJ also considered attorney Shull's

argument that there was good cause to reopen the unfavorable decision issued by the prior ALJ

on December 13, 2010. (Tr. 30). To support his argument, attorney Shull referenced Pitman's

worsening depression and her new diagnoses of fibromyalgia, chronic obstructive pulmonary,

sleep apnea, insomnia, vitamin D deficiency, and borderline diabetes. (Tr. 30). The ALJ

concluded that new evidence existed, however, a detailed analysis showed that it was not

material evidence.  (Tr. 30).  The ALJ determined that the new evidence was irrelevant and that it did not show that the prior decision was contrary to the weight of the evidence.  (Tr. 30).

The ALJ noted that the prior ALJ did not consider Pitman's diagnosis of fibromyalgia but that she did consider Pitman's subjective complaints.  (Tr. 31).  The ALJ found that Pitman's subjective complaints of pain in multiple areas and other symptoms were not different in nature and/or severity than the prior decision.  (Tr. 31).  After the December 23, 2010 decision, Dr. Rudy Kachmann reported that while an MRI study of the cervical and lumbar areas showed a lumbar degenerative disc disease it was nothing unusual.  (Tr. 31-32).  The ALJ noted that MRI's in August and November of 2012 revealed relatively unchanged findings.  (Tr. 32).

Pitman's diagnostic test results with respect to her left thumb, hands, wrists, left shoulder, and feet failed to show any additional significant findings that required greater functional limitations than those found in the prior decision.  (Tr. 32).  The prior ALJ considered Pitman's physical examinations by treating sources and a consultative examiner.  (Tr. 32).  The exams showed:  normal gait; no difficulty walking; mild halting features getting on and off the exam table and out of a chair; limited range of motion in neck, back, hips, and ankles; intact motor power in the extremities; tenderness in the thoracic and lumbar spines; and normal fine-finger manipulation abilities.  (Tr. 32).

The prior ALJ did not specifically reference the May 13, 2009, evaluation by Dr. Michele Thurston, but the ALJ noted that it was in Pitman's file.  (Tr. 32).  Dr. Thurston did not diagnose Pitman with fibromyalgia, but she found tender points along the musculature in the paraspinal muscles and muscle knots in the scapula bilaterally.  (Tr. 32).  The ALJ found that evaluations after the December 13, 2010 decision did not reflect greater functional limitations.  (Tr. 32).  The ALJ indicated that the examination by Family Associates in February and April of 2011 showed

that Pitman walked without any disturbance of gait. (Tr. 32-33). At the February 2012 exam,

Dr. Kachmann noted that Pitman walked with a normal gait, but that she had tenderness in her

neck, shoulder, low back, and right/left buttock areas. (Tr. 33). Dr. Monica Reddy in September

of 2012 also reported full and painless range of motion of the lumbar, as well as the cervical

spine. (Tr. 33). From September 2012 to August 2013, Pitman showed moderate restriction in

lumbar range. (Tr. 33). The ALJ noted that beginning in 2012 Pitman's condition worsened, yet

the records did not show greater functional limitations than those observed by the prior ALJ.

(Tr. 34).

The ALJ determined that the evidence after the December 13, 2010 decision did not show

that Pitman had any pulmonary symptoms or functional limitations greater than those already

considered. (Tr. 34). The previous evidence reflected a history of treatment for breathing

ailments in 2007, 2008, and 2009. (Tr. 34). The ALJ indicated that Pitman had exacerbations of

chronic obstructive pulmonary disease (COPD) in January, April, and November of 2011. (Tr.

34). Also, in May of 2012, a pulmonary function study showed severe obstructive lung defect

with mild response to bronchodilator that required hospitalization for exacerbation of COPD.

(Tr. 35).

Dr. Eustace Fernandes noted decreased breath sounds, diminished inspiratory excursion,

and increased AP diameter, but no use of accessory muscles of respiration. (Tr. 35). The ALJ

found Dr. Fernandes' records noteworthy because they indicated that Pitman continued to smoke

and that she consistently denied chest pain or tightness. (Tr. 35). The ALJ found inconsistencies

in Dr. Fernandes' treatment record. (Tr. 35). Also, the ALJ noted that Dr. Fernandes' records

indicated that Pitman could do activities of daily living without assistance and housework

without limitations but that she was unable to participate in sports. (Tr. 35). The ALJ concluded

that these assessments were self-reports made by Pitman. (Tr. 35). Dr. Fernandes referred Pitman for pulmonary rehab. (Tr. 35). However, the ALJ noted that there was no record that she followed his recommendation. (Tr. 35). The ALJ also noted examinations by other sources that found Pitman was breathing easily and that her lungs were clear. (Tr. 35).

The prior ALJ addressed Pitman's insomnia and sleep apnea. (Tr. 36). In her June 2009 consultative psychological evaluation, Pitman reported that she had difficulty falling and staying asleep and that she slept for approximately five hours a night. (Tr. 36). The ALJ concluded that the new evidence showed that Pitman had mild sleep apnea. (Tr. 37). On September 16, 2013, Pitman reported that her treatment of Modafinil/Provigil was working well, but she made inconsistent statements when she testified. (Tr. 37). She testified that despite taking the medication she had to nap two to three days a week and that shortly after her naps she was ready to go back to sleep. (Tr. 37). The ALJ found that Pitman's sleep problems could be controlled by proper treatment and that Pitman failed to show that her sleep problems were disabling for a period of 12 months. (Tr. 37).

The ALJ also determined that there was no evidence to support that Pitman's borderline diabetes could not be controlled with proper treatment or that it was disabling for a period of 12 months. (Tr. 37). In May of 2013, Pitman had an elevated fasting insulin and was started on Metformin. (Tr. 37). It was recommended that she have 1200 calorie diet and that she exercise five times a week. (Tr. 37). The ALJ also concluded that there was no evidence that Pitman's vitamin D deficiency affected her ability to work nor did Pitman mention complications or a need for more aggressive treatment. (Tr. 37).

Pitman testified that her hands cramped after five to ten minutes and that she could not use them to handle items for more than 15 minutes out of an hour. (Tr. 37-38). Pitman indicated

that she was unwilling to have surgery on her left hand because she claimed that her right carpal tunnel surgery did not help. (Tr. 38). However, the ALJ reported that examinations by other sources did not support her allegations. (Tr. 38). A June 2012 consultative exam noted normal dexterity and normal muscle strength in all four extremities, as well as Dr. Lutz noted normal power and strength in upper extremities. (Tr. 38). Dr. Reddy indicated that Pitman had no pain, swelling, or crepitus in her fingers, wrists, and elbows. (Tr. 38). In June of 2012 and February and August of 2013, Dr. Fernandes noted normal muscle strength and tone and normal power in her upper extremities. (Tr. 38).

The ALJ indicated that the evidence also did not support Pitman's complaints of kaleidoscope vision followed by severe headaches. (Tr. 38). The ALJ found that the testing did not reveal any abnormalities. (Tr. 38). The ALJ determined that the impairment was not severe after considering Pitman's limited treatment, the absence of significant abnormalities, and the minimal effect it had on her ability to work. (Tr. 39).

The ALJ noted that Pitman indicated that her medications did not help. (Tr. 39). Yet, the ALJ found that Dr. Lutz's exams consistently showed that she was not in acute distress. (Tr. 39). The ALJ concluded that her statements were generally unbelievable because it seemed unlikely that she would continue treatment with Dr. Lutz for a year and a half without improvement. (Tr. 39). The ALJ also noted that Pitman's testimony indicated that she had extremely limited physical capabilities. (Tr. 39). She stated that after sitting an hour she needed to walk, but after walking she could sit for only 15 to 20 minutes before needing to walk again. (Tr. 39). The ALJ found that Pitman's testimony was not fully credible. (Tr. 39). He noted that her testimony of an inability to sit for short durations was contradicted by her ability to drive to the hearing, Fort Wayne, the grocery store, and doctors' appointments in her hometown. (Tr. 39-40).

The ALJ found that the physicians' recommendations to walk as much as possible, continue increased activities, range of motion stretching, and aerobic activities were not consistent with an inability to work or to do sedentary work activities. (Tr. 40). The ALJ also noted that given Pitman's allegations of totally disabling symptoms her treating doctors failed to include any work restrictions in her treatment records. (Tr. 40). State agency medical consultants determined that Pitman could perform medium work activities, however, the ALJ assigned little weight to their opinions because they were outdated and inconsistent with the prior decision that limited Pitman to light work. (Tr. 40).

The ALJ generally agreed with the prior ALJ's decision but noted that Pitman's symptoms worsened in 2012. (Tr. 40). The ALJ found that diagnostic testing showed a mild lumbar disc disease and a mild to moderate cervical disc disease. (Tr. 40). Therefore, in considering those results and Pitman's absence of functional limitations on physical examination, the ALJ found that she was capable of sitting for six to eight hours during an eight hour workday. (Tr. 40). Also, due to her obesity and shortness of breath, she was limited to two hours standing and/or walking, occasional postural changes, and no climbing of ladders, ropes, or scaffolds. (Tr. 40). However, she was capable of bending or stooping. (Tr. 40). The ALJ accommodated Pitman's shoulder and hand pain by not requiring her to lift/carry more than ten pounds and limiting her to only frequent reaching and fine/gross manipulation tasks. (Tr. 40). The ALJ limited Pitman to work that involved less than occasional exposure to extreme cold. (Tr. 40). Also, to prevent exacerbations of the Pitman's chronic pulmonary disease, she was limited to less than occasional exposure to concentrated amounts of fumes, dust, and gases. (Tr. 40).

The prior ALJ's decision determined that Pitman's mental condition was not severe. (Tr. 41). She accounted for limitations in her RFC by limiting Pitman to routine, repetitive tasks that required a goal-oriented, but not a fast pace. (Tr. 41). The ALJ stated that he considered that Pitman's depression had worsened since the prior decision. (Tr. 41). However, he was in general agreement and found that Pitman could perform simple, routine, and repetitive tasks and maintain sufficient level of concentration to perform simple tasks and remember simple work-like procedures. (Tr. 41).

The ALJ considered Pitman's testimony that her depression was worse after the prior decision and before her treatment at the Bowen Center. (Tr. 42). The ALJ indicated that in August 2011 Pitman complained that she wanted to cry all the time, but a September 2011 visit to the emergency room indicated that she was cooperative and displayed a calm affect and appropriate mood. (Tr. 42). Also in November 2011, she complained that she was crying, irritable, tired, and not sleeping well. (Tr. 42). She was prescribed Lexapro and reported that the medication was helping. (Tr. 42). The ALJ found that the medical facts and objective medical findings were inconsistent with the allegations of severe and disabling limitations of function lasting 12 months in duration despite treatment. (Tr. 42).

In June of 2012, Dr. Fernandes reported that Pitman was alert and oriented to person, place, and time. (Tr. 42). Also in June 2012, consultative psychological evaluator Kenneth Bundza, Ph.D., determined that Pitman did not have any marked cognitive or intellectual impairments and rated her overall functioning at 65. (Tr. 42). The State agency psychologist agreed with Dr. Bundza's GAF rating and his mental status exam results, and concluded that Pitman did not have a severe mental impairment. (Tr. 42). The ALJ noted that Pitman's depression did worsen in 2011 but that Pitman reported it lasted only six months. (Tr. 42).

Treatment records after Pitman started at the Bowen Center indicated that she had no deficiencies in personal care or social interaction. (Tr. 43). The records showed that she was able to maintain good eye contact and communicate and that her speech had normal content, comprehension, and tone. (Tr. 43). The ALJ found that Pitman's therapy records indicated worsening symptoms but that the treatment records failed to show that Pitman had greater functional limitations than those given in the previous RFC. (Tr. 44).

At step four, the ALJ found that Pitman could not perform her past relevant work. (Tr. 45). Considering Pitman's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that she could perform, including sorter (400 to 450 jobs regionally, 20,000 jobs in Indiana, and 500,000 jobs nationally), assembler (100 to 150 jobs regionally, 5,000 jobs in Indiana, and 230,000 jobs nationally), and a final assembler (200 to 240 jobs regionally, 10,000 jobs in Indiana, and 500,000 jobs nationally). (Tr. 45).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,

217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and

mental demands of her past work.  If, at this fourth step, the claimant can perform her past

relevant work, she will be found not disabled.  **20 C.F.R. §§ 404.1520(e)**.  However, if the

claimant shows that her impairment is so severe that she is unable to engage in her past relevant

work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light

of her age, education, job experience, and functional capacity to work, is capable of performing

other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R.**

**§§ 404.1520(f)**.

First, Pitman has argued that the ALJ failed to incorporate his conclusion that Pitman had

moderate difficulties in concentration, persistence, or pace into the hypothetical question posed

to the VE.  The ALJ's RFC assessment and the hypothetical posed to the VE must incorporate all

of the claimant's limitations supported by the medical record.  ***Yurt v. Colvin***, 758 F.3d 850, 857

(7th Cir. 2014) (citing ***O'Connor-Spinner v. Astrue***, 627 F.3d 614, 619 (7th Cir. 2010));

***Indoranto v. Barnhart***, 374 F.3d 470, 473–74 (7th Cir. 2004) ("If the ALJ relies on testimony

from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the

claimant's limitations supported by medical evidence in the record.").  That includes any

deficiencies the claimant has in concentration, persistence, or pace.  ***Yurt***, 758 F.3d at 857;

***O'Connor-Spinner***, 627 F.3d at 619 ("Among the limitations the VE must consider are

deficiencies of concentration, persistence and pace."); ***Stewart v. Astrue***, 561 F.3d 679, 684 (7th

Cir. 2009) (indicating the hypothetical question "must account for documented limitations of

'concentration, persistence, or pace'") (collecting cases).  The most effective way to ensure that

the VE is fully apprised of the claimant's limitations is to include them directly in the

hypothetical.  ***O'Connor-Spinner***, 627 F.3d at 619.

However, ALJs do not need to state explicitly "concentration, persistence, or pace" in the hypothetical for all cases. *Yurt*, 758 F.3d at 857; *O'Connor-Spinner*, 627 F.3d at 619. Rather, a court may assume a VE's familiarity with a claimant's limitations, despite deficiencies in the hypothetical, when the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner*, 627 F.3d at 619; *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). This exception does not apply if the ALJ poses a series of increasingly restrictive hypotheticals because courts infer that the VE's attention is focused on the hypotheticals and not the record. *O'Connor-Spinner*, 627 F.3d at 619; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). The ALJ posed a series of increasingly restrictive hypotheticals. (Tr. 101-104). Therefore, this exception does not apply.

An ALJ's hypothetical may omit "concentration, persistence, or pace" when it is clear that the ALJ's phrasing specifically excluded tasks that someone with the claimant's limitations could not perform. *O'Connor-Spinner*, 627 F.3d at 619. For example, courts have upheld hypotheticals that restricted a claimant to low-stress work when the limitations were stress or panic related. *See Johansen v. Barnhart*, 314 F.3d 283, 285, 288–89 (7th Cir. 2002) (upholding a hypothetical formulated in terms of "repetitive, low-stress" work because the description eliminated positions likely to trigger symptoms of the panic disorder that originated the claimant's moderate limitations in concentration, persistence, or pace); *Arnold v. Barnhart*, 473 F.3d 816, 820, 823 (7th Cir. 2007) (upholding a hypothetical that restricted the claimant to low-stress, low-production work when stress-induced headaches, frustration, and anger caused the claimant's difficulties in concentration, persistence, or pace). The ALJ did not use the term low-stress nor are the ALJ's limitations stress or panic related. Therefore, this exception does not apply.

Courts may uphold a hypothetical that does not mention "concentration, persistence, or pace" when the underlying conditions were mentioned and the link between the underlying condition and the concentration difficulties was apparent enough to incorporate those difficulties by reference. *See Simila*, 573 F.3d at 521–22 (upholding the hypothetical but indicating the failure to include the specific limitations was "troubling"). Generally, terms like "simple, repetitive tasks" alone do not exclude from the VE's consideration those positions that present significant problems with concentration, persistence, or pace. *Stewart*, 561 F.3d at 684–85 (finding hypothetical limited to simple, routine tasks did not account for limitations of concentration, persistence, or pace); *see Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) (posing hypothetical as individual of borderline intelligence did not account for limitations of concentration). The ALJ did not mention Pitman's underlying conditions. Therefore, this exception does not apply.

The ALJ found that Pitman had moderate difficulties in concentration, persistence, or pace. (Tr. 28). The ALJ posed the following hypothetical to the VE:

> Please assume an individual of the claimant's age, education, and past work. Such hypothetical individual is capable of sitting for six to eight hours out of an eight hour work day, carrying, pushing and pulling ten pounds throughout the work day. The individual's -- no ropes, ladders, or scaffolds, occasional stairs and ramps, frequent bending and stooping in addition to what is already required to sit. The individual is capable of frequent reaching and frequent fine and gross manipulation with the upper extremities. The individual is limited to simple, routine, repetitive tasks. The individual can maintain the concentration required to perform simple tasks, and can remember simple work like procedures. I'm going to add to that the individual's limited to more – to occasional exposure – to less than occasional exposure to concentrated and extreme amounts of fumes, dust, and gases as well as extreme cold. Could such an individual be able to perform the past work as she performed it or as it is otherwise performed in the national economy?

(Tr. 101-102). Based on the hypothetical, the VE determined that Pitman could not perform her past relevant work but that she could perform work in the sedentary level. (Tr. 102).

The Commissioner has argued that the ALJ limited Pitman to simple, routine, and repetitive tasks and remembering only simple work-like procedures and work where she could maintain a sufficient level of concentration to perform simple tasks. Therefore, the Commissioner contends that the ALJ went beyond a limitation to unskilled work or simple and repetitive tasks. The Commissioner also has made arguments that pertained to the ALJ's RFC. However, Pitman's contention is that the ALJ did not include moderate limitations in concentration, persistence, or pace in his hypothetical to the VE.

The ALJ limited Pitman to simple, routine, and repetitive tasks. Courts repeatedly have held terms like "simple, repetitive tasks" alone do not exclude from the VE's consideration those positions that present significant problems with concentration, persistence, or pace. *Stewart*, 561 F.3d at 684–85 (finding hypothetical limited to simple, routine tasks did not account for limitations of concentration, persistence, or pace); *see also Varga,* 794 F.3d at 814.

However, the ALJ went further and found that Pitman could maintain the concentration required to perform simple tasks and could remember simple work-like procedures. The ALJ's hypothetical failed to go beyond the limitation of simple, repetitive tasks. A hypothetical that described an individual who could "remember and carry out unskilled task[s] without special considerations" did not account for claimant's limitations in concentration, persistence, or pace. *Yurt v. Colvin,* 748 F.3d 850, 855, 858–59 (7th Cir. 2014). Therefore, limiting Pitman to remembering and carrying out simple tasks did not suffice. *See Reed v. Colvin,* 2016 WL 3537194, at *5 (N.D. Ind. 2016). Limitations to "simple, repetitive tasks" in the hypothetical posed to VEs do not generally account for limitations in concentration, persistence, and pace.

*O'Connor–Spinner,* 627 F.3d at 620 (where the claimant's concentration problems were depression-related and a hypothetical for "repetitive tasks with simple instructions" was found inadequate).  The hypothetical failed to account for Pitman's psychosocial stressors and ongoing pain that the ALJ found caused her distractions and that created difficulties for her to sustain concentration and focus.  (Tr. 28).

Therefore, the ALJ erred on this issue.  On remand, the ALJ should include Pitman's limitations in concentration, persistence, or pace in the hypothetical presented to the VE.

Next, Pitman has argued that the ALJ improperly evaluated the credibility of her symptom testimony.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence."

**20 C.F.R. § 404.1529(a)**; *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).  If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  **20 C.F.R. § 404.1529(c)**; *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not disregard an individual's statements about symptoms solely based on objective medical evidence.  SSR 16-3p, at *5[3]; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily

---

[3]    The Social Security Administration updated its guidance about evaluating a claimant's symptoms.  *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016).  SSR 16-3p superseded SSR 96-7p and removed the term "credibility" from the Administration's policies.  SSR 16-3p at *1.  The new policy clarifies that an ALJ should not examine a claimant's character similar to an adversarial proceeding when evaluating the claimant's subjective symptoms.  SSR 16-3p at *1.  Although SSR 16-3p post-dates the ALJ hearing in this case, a regulation that clarifies rather than changes existing law is appropriate on appeal.  *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).  Because SSR 16-3p clarifies the Administration's policies, this court will evaluate the ALJ's findings under the Administration's new guidance.  *See Roper v. Colvin*, 2016 WL 3940035, at *3 (N.D. Ill. July 21, 2016) (finding it appropriate to consider the new regulation on appeal).

activities solely by stating that such testimony is unsupported by the medical evidence.'")

(quoting *Indoranto*, 374 F.3d at 474); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)

("If pain is disabling, the fact that its source is purely psychological does not disentitle the

applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her
> alleged inability to work, the ALJ must obtain detailed descriptions
> of the claimant's daily activities by directing specific inquiries about
> the pain and its effects to the claimant. He must investigate all
> avenues presented that relate to pain, including claimant's prior
> work record, information and observations by treating physicians,
> examining physicians, and third parties. Factors that must be
> considered include the nature and intensity of the claimant's pain,
> precipitation and aggravating factors, dosage and effectiveness of
> any pain medications, other treatment for relief of pain, functional
> restrictions, and the claimant's daily activities. (internal citations
> omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881,

887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is

inconsistent with the objective medical evidence, he must make more than "a single, conclusory

statement . . . . The determination or decision must contain specific reasons for the weight given

to the individual's symptoms, be consistent with and supported by the evidence, and be clearly

articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms." SSR 16-3p, at *9; *see Minnick v. Colvin*, 775 F.3d 929,

937 (7th Cir. 2015) ("[A] failure to adequately explain his credibility finding by discussing

specific reasons supported by the record is grounds for reversal.") (citations omitted); *Zurawski*,

245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307–08 (7th Cir. 1995) (finding that the ALJ must

articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and

logical bridge from the evidence to his conclusion." *Zurawski*, 245 F.3d at 887 (quoting

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible.  *Bates*, 736 F.3d at 1098.  However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability.  *Bates*, 736 F.3d at 1099.

First, Pitman contends that the ALJ improperly faulted her for her respiratory problems.  The ALJ reported that Pitman had exacerbations of breathing problems but that they were short lived and resolved with treatment.  (Tr. 36).  The ALJ noted that Dr. Fernandes' records indicated that Pitman continued to smoke despite shortness of breath and that she consistently denied chest pain or tightness.  (Tr. 35).  Also, the ALJ found that the record did not indicate that Pitman followed Dr. Fernandes' referral for pulmonary rehabilitation.  (Tr. 35).  Pitman contends that Dr. Fernandes reported that she was in compliance with her treatment.  The ALJ failed to question Pitman about her lack of treatment and thus must not draw inferences from this failure.  *See **Craft v. Astrue***, 539 F.3d 668, 679 (7th Cir. 2008) ("[T]he ALJ 'must not draw any inferences' about a claimant's condition unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (quoting **SSR 96-7p**).

Pitman has argued that the ALJ cherry-picked evidence.  Pitman indicated that the ALJ failed to cite that she had made attempts to cut down on her cigarette smoking.  The ALJ found that Pitman's diagnosis of asthmatic bronchitis was associated with tobacco abuse.  (Tr. 34).  The Commissioner acknowledged that it was unreliable to rest a credibility determination on Pitman's use of tobacco.  The ALJ only noted that Pitman continued to smoke and that smoking exacerbated her symptoms.  The Commissioner has argued that the ALJ did not find that if Pitman stopped smoking her ability to work would be restored or that her statements were less credible because she smoked.

Next, Pitman has argued that her statement that the medications taken to control her sleep problems worked well was not inconsistent with her testimony that she napped two or three days a week. Pitman contends that it was improper for the ALJ to assume that since she stated that the medications helped her that she no longer had problems. The Commissioner contends contrary to Pitman's argument that the ALJ discussed Pitman's sleep apnea in his RFC finding and restricted her to sedentary work with appropriate limitations in postural activities and maintaining concentration. The ALJ listed Pitman's sleep apnea as a severe impairment at step two. (Tr. 26). Therefore, the ALJ found that Pitman's sleep apnea placed limitations on her and did not ignore evidence.

Pitman has argued that the ALJ failed to cite contrary evidence regarding problems relating to her hands. She referred to a MRI taken in 2013 that showed a number of objective problems with her hands. However, the ALJ did account for other evidence and considered Pitman's carpal tunnel syndrome a severe impairment at step two. Also, he discussed the nerve conduction studies, which showed mild bilateral median neuropathy and placed a restriction on fine and gross manipulation in the RFC. The ALJ credited Pitman's complaints, therefore the ALJ's failure to reference the MRI taken in 2013 was inconsequential to the outcome of disability.

The ALJ acknowledged Pitman's diagnosis of respiratory issues, sleep apnea, and carpal tunnel syndrome. He cited medical evidence that suggested Pitman was capable of only sedentary work and placed restriction on her fine and gross manipulation in the RFC. Also, to account for Pitman's respiratory issues, the ALJ limited her work environment to tolerate less than occasional exposure to concentrated amounts of fumes, dust, gases, and extreme cold. (Tr.

30).  Therefore, the ALJ accounted Pitman's limitations and discussed her medical history at length building a logical bridge from the evidence to his conclusion.

Pitman contends that the lack of clarity in the ALJ's questioning undercut his finding that her testimony about the effectiveness of her treatment was inconsistent.  Pitman contends that the ALJ failed to make clear in his questioning whether he was inquiring into the long term or short term effects of her medications.  The Commissioner has argued that the ALJ's credibility findings do not have to specify which statements were not credible.  Rather, the ALJ concluded that Pitman's limiting effects of her impairments were not adequately reflected in the medical opinion evidence, treatment history, and activities for the period in question.

The ALJ cited substantial evidence in the record which was inconsistent with Pitman's testimony.  Pitman reported that Cymbalta was helpful, treatment with intramuscular morphine sulfate and valium made her back pain feel much better, and Dr. Lutz's exams from December 2011 to August 2013 reported her as pleasant and in no acute distress.  (Tr. 39).  The Seventh Circuit has held that where an ALJ's credibility determination has evidentiary support, it is not patently wrong. ***Crawford v. Astrue,*** 633 F.Supp.2d 618, 633–34 (N.D. Ill. 2009); *See **Jens v. Barnhart***, 347 F.3d 209, 213–14 (7th Cir. 2003) (where the ALJ's credibility determination was supported by evidence in the record, it was not patently wrong even though the ALJ did not specify which of claimant's statements were not credible, nor provide evidentiary support in his decision).

Next, Pitman has argued that the ALJ inappropriately considered her activities of daily living, like her ability to drive.  The ALJ noted that Pitman was able to drive to Fort Wayne for doctor appointments, the grocery store, local doctor appointments, and the hearing.  (Tr. 39-40).  The ALJ indicated that Pitman's ability to drive was inconsistent with her extremely limited

capacities for sitting.  (Tr. 39-40).  Instead of making assumptions, the ALJ should have inquired into this issue at the hearing.  The ALJ failed to explain how the ability to drive undermined her medical complaints.

The ALJ found that Pitman's physicians' recommendations for treatment were not consistent with her alleged significant limitations.  (Tr. 40).  The ALJ noted that Pitman's doctors recommended that she walk as much as possible, bike, and swim and that she do aerobic exercises, tai chi, and yoga.  (Tr. 40).  The ALJ concluded that if Pitman was as limited as she alleged her doctors would not recommend such a rigorous regimen of activities.  Pitman has argued that the treatment suggested by her doctors was appropriate for her fibromyalgia.  The regulations expressly permit the ALJ to consider a claimant's treatment history.  **20 C.F.R. § 404.1529(c)(3)(v).**   Because the ALJ's are given deference, the court will not question the ALJ's finding that Pitman's treatment was rigorous given her alleged impairments.  *See **Simila v. Astrue,*** 573 F.3d 503, 519 (7th Cir. 2009).  Therefore, the ALJ reasonably found that these activities were inconsistent with Pitman's testimony and her claims of limitations.

Pitman has argued that since she was unemployed medical records will be devoid of work restrictions.  The absence of major work restrictions in Pitman's medical records does not illuminate the question of her credibility because she was unemployed throughout the time in question.  ***Eskew v. Astrue,*** 462 Fed.Appx 613, 616 (7th Cir. 2011) (unpublished).  Finally, Pitman has argued that the ALJ failed to consider her good work history.  The Commissioner correctly has argued that work history was just one factor among many and it was not dispositive.  ***Shumaker v. Colvin***, 632 Fed.Appx. 861, 867 (7th Cir. 2015).

Pitman has pointed to errors in the ALJ's credibility analysis, however, it was not patently wrong.  Therefore, the ALJ has built an accurate and logical bridge from the evidence to

his credibility finding.  The ALJ properly consider Pitman's subjective complaints and provided specific evidence to undermine the credibility of those complaints.  He based his analysis on multiple factors as the regulations require.  However, since this matter is being remanded on a separate issue, the ALJ can explain his credibility determination on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this order.

ENTERED this 31st day of March, 2017.

/s/ Andrew P. Rodovich
United States Magistrate Judge